20-1209-bk
In re: Clinton Nurseries

# In the
# United States Court of Appeals
## for the Second Circuit

---

August Term, 2020
No. 20-1209-bk

IN RE: CLINTON NURSERIES, INC.; CLINTON
NURSERIES OF MARYLAND, INC.; CLINTON
NURSERIES OF FLORIDA, INC.; TRIEM LLC,
*Debtors*.

CLINTON NURSERIES, INC.; CLINTON NURSERIES OF MARYLAND, INC.;
CLINTON NURSERIES OF FLORIDA, INC.,
*Debtors-Appellants*,

TRIEM LLC,
*Debtor*,

*v.*

WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, REGION 2,
*Trustee-Appellee*.

---

Appeal from the United States Bankruptcy Court
for the District of Connecticut.
No. 17-31897— James J.  Tancredi, *Judge*.

---

CERTIFIED COPY ISSUED ON 05/24/2021

Argued: October 23, 2020
Decided: May 24, 2021

Before: Raggi, Sullivan, and Nardini, *Circuit Judges*.

————————————————————

Debtors-Appellants Clinton Nurseries, Inc., Clinton Nurseries of Maryland, Inc., and Clinton Nurseries of Florida, Inc. appeal from an order of the Bankruptcy Court (James J. Tancredi, *J.*) entered on August 29, 2018, rejecting their constitutional challenge to quarterly fees imposed during the pendency of their bankruptcy proceeding. In 2017, Congress passed an amendment (the "2017 Amendment") to the statute setting forth quarterly fees in bankruptcy cases, 28 U.S.C. § 1930. The 2017 Amendment increased quarterly fees in judicial districts in which the United States Trustee Program oversees bankruptcy administration ("UST Districts"). Judicial districts in which judicially appointed bankruptcy administrators perform the same function ("BA Districts") did not immediately adopt an equivalent fee increase. Congress later passed the Bankruptcy Administration Improvement Act of 2020, Pub. L. No. 116-325 (the "2020 Act"), which requires that UST Districts and BA Districts charge equal fees. Appellants are debtors who filed for bankruptcy in a UST District and were charged the 2017 Amendment's fee increase during a period in which BA Districts were charging lower fees. The Bankruptcy Court rejected Appellants' argument that the 2017 Amendment violated the uniformity requirement of the Bankruptcy Clause of the United States Constitution. We hold that the 2017 Amendment is a bankruptcy law subject to the uniformity requirement of the Bankruptcy Clause. We also hold that, under the version of § 1930 in effect prior to the 2020 Act, the 2017 Amendment violated the uniformity requirement. We therefore **REVERSE** the decision of the Bankruptcy Court.

————————————————————

ERIC A. HENZY (Christopher H. Blau, *on the brief*), Zeisler & Zeisler, P.C., Bridgeport, Connecticut, *for Debtors-Appellants.*

JEFFREY B. CLARK (Ethan P. Davis, Mark B. Stern, Jeffrey E. Sandberg, Ramona D. Elliott, P. Matthew Sutko, and Beth A. Levene, *on the brief*), U.S. Department of Justice, Washington, D.C., *for Trustee-Appellee.*

WILLIAM J. NARDINI, *Circuit Judge*:

Judicial districts in the United States fall into two categories: those in which the United States Trustee Program oversees bankruptcy administration ("UST Districts") and those in which judicially appointed bankruptcy administrators perform the same function ("BA Districts"). *See Matter of Buffets, L.L.C.*, 979 F.3d 366, 370 (5th Cir. 2020). In 2017, Congress passed an amendment (the "2017 Amendment") to 28 U.S.C. § 1930, the statute setting forth quarterly fees in bankruptcy cases. *Id.* at 371. The 2017 Amendment increased quarterly fees in UST Districts, but the Judicial Conference of the United States ("Judicial Conference") did not immediately impose a parallel increase in the BA Districts. *Id.* at 372. Congress later passed the Bankruptcy Administration Improvement Act

of 2020, Pub. L. No. 116-325 (the "2020 Act"), which modified § 1930 to clearly mandate that UST Districts and BA Districts charge equal fees.

Debtors-Appellants Clinton Nurseries, Inc., Clinton Nurseries of Maryland, Inc., and Clinton Nurseries of Florida, Inc. (collectively, "Clinton") filed for bankruptcy in December 2017 in the District of Connecticut, which is a UST District. Clinton incurred fees in accordance with the increase set forth in the 2017 Amendment during the period after the 2017 Amendment but before the effective date of the 2020 Act, *i.e.*, while the BA Districts were charging lower fees.

Clinton now appeals from an order of the Bankruptcy Court (James J. Tancredi, *J.*) entered on August 29, 2018, rejecting Clinton's constitutional challenge to the 2017 Amendment. Specifically, the Bankruptcy Court rejected Clinton's argument that, under the version of § 1930 in effect prior to the 2020 Act, the 2017 Amendment violated the Bankruptcy Clause of the United States Constitution, which empowers Congress to enact "*uniform* Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4 (emphasis added).

We hold that the 2017 Amendment is a "Law[] on the subject of Bankruptcies," *id.*, implicating the uniformity requirement of the Bankruptcy Clause.  We also hold that, under the version of § 1930 in effect prior to the 2020 Act, the 2017 Amendment violated the uniformity requirement.  We therefore **REVERSE** the decision of the Bankruptcy Court.

I.      **Background**

      A.      **Quarterly fees in UST and BA Districts prior to the 2017 Amendment**

The U.S. Trustee Program, which is part of the U.S. Department of Justice, oversees bankruptcy administration in 88 of the 94 federal districts.  *See* 28 U.S.C. § 581(a); *Buffets*, 979 F.3d at 370.  Judicially appointed bankruptcy administrators, with the oversight of the Judicial Conference, perform the same role in the remaining six districts, which are located in North Carolina and Alabama.  *See* Federal Courts Improvements Act of 2000, Pub. L. No. 106-518 § 501, 114 Stat. 2410, 2421 (2000); *Buffets*, 979 F.3d at 370; *USA Sales, Inc. v. Off. of the United States Tr.*, No. 5:19-cv-02133, 2021 WL 1226369, at *3 (C.D. Cal. Apr. 1, 2021).

Congress funds the U.S. Trustee Program through annual appropriations, offset by money in an account known as the United States Trustee System Fund. *See* 28 U.S.C. § 589a; *In re Prines*, 867 F.2d 478, 480 (8th Cir. 1989). Most of the money in the United States Trustee System Fund comes from quarterly fees paid by debtors in UST Districts pursuant to 28 U.S.C. § 1930(a)(6). Section 1930(a)(6)(A) provides in relevant part:

> [A] quarterly fee shall be paid to the United States trustee . . . in each case under chapter 11 of title 11 . . . for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first.

In creating the United States Trustee System Fund and mandating quarterly fees, Congress sought to ensure the trustee program would be paid for "by the users of the bankruptcy system—not by the taxpayer." H.R. Rep. No. 99-764 at 22.

Initially, only debtors in UST Districts paid quarterly fees. *See Buffets*, 979 F.3d at 371. In 1994, however, the Ninth Circuit held that the absence of quarterly fees in BA Districts was unconstitutionally non-uniform. *See St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1535 (9th Cir. 1994). Congress thereafter enacted

6

§ 1930(a)(7) to provide for corresponding quarterly fees in BA Districts, stating in

relevant part:

> In districts that are not part of a United States trustee region [i.e. BA
> Districts]. . . , the Judicial Conference of the United States may require
> the debtor in a case under chapter 11 of title 11 to pay fees equal to
> those imposed by paragraph (6) of this subsection.

28 U.S.C. § 1930(a)(7) (2000).  BA Districts deposit these quarterly fees into a fund

that offsets judicial branch appropriations.  *See id*.

Following the passage of § 1930(a)(7), the Judicial Conference harmonized

fees in UST and BA Districts by directing that quarterly fees be imposed in BA

Districts "in the amounts specified in 28 U.S.C. § 1930."  *Report of the Proceedings of*

*the Judicial Conference of the United States* 45–46 (Sept./Oct. 2001),

https://go.usa.gov/xf2vr.  This parity remained in place until the first quarter of

2018, when the 2017 Amendment took effect in the UST Districts.

### B.    The 2017 Amendment

Section 1930(a)(6) ties the amount of a debtor's fee in a UST District to the

size of "disbursements"—*i.e.*, the debtor's payments to third parties.  28 U.S.C.

§ 1930(a)(6)(A).  The larger the disbursements, the larger the quarterly fee.[1]  Prior to the 2018 effective date of the 2017 Amendment, the maximum fee under § 1930(a)(6) was "$30,000 for each quarter in which disbursements total more than $30,000,000."  28 U.S.C. § 1930(a)(6) (2008).

In 2017, Congress amended § 1930(a)(6) to temporarily add to the existing fee schedule an even higher fee where disbursements equaled or exceeded $ 1 million.  The 2017 Amendment states as follows:

---

[1] Specifically, the statute, both before and after the 2017 amendment, provides in relevant part:

> The fee shall be $325 for each quarter in which disbursements total less than $15,000; $650 for each quarter in which disbursements total $15,000 or more but less than $75,000; $975 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,625 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,950 for each quarter in which disbursements total $225,000 or more but less than $300,000; $4,875 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $6,500 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $9,750 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $10,400 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $13,000 for each quarter in which disbursements total $5,000,000 or more but less than $15,000,000; $20,000 for each quarter in which disbursements total $15,000,000 or more but less than $30,000,000; $30,000 for each quarter in which disbursements total more than $30,000,000.

28 U.S.C. § 1930(a)(6)(A) (2017); 28 U.S.C. § 1930(a)(6) (2008).

During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

*Id.* § 1930(a)(6)(B) (2017). Congress enacted the 2017 Amendment after observing a decreasing balance in the United States Trustee System Fund, due to a nationwide decline in bankruptcy filings. *See Buffets*, 979 F.3d at 371; *USA Sales, Inc.*, 2021 WL 1226369, at *4.

As a result of the enactment of the 2017 Amendment, the parity of fees between UST Districts and BA Districts came to an end at the start of 2018. While UST Districts began implementing the fee increase in the first quarter of 2018, the BA Districts did not do so immediately. *See Buffets*, 979 F.3d at 372. Rather, it was not until September 2018 that the Judicial Conference adopted an equivalent fee increase in BA Districts. *See Report of the Proceedings of the Judicial Conference of the United States* 11–12 (Sept. 13, 2018), https://www.uscourts.gov/sites/default/files/2018-09_proceedings.pdf. Even then, the Judicial Conference instructed that the fee increase would not take effect

until October 1, 2018, and would apply only to cases filed after that date. *Id.* Thus, a debtor in a BA District who filed for bankruptcy prior to October 1, 2018, would never be charged the fee increase "no matter how long the case remain[ed] pending." *Buffets*, 979 F.3d at 372. By contrast, "all qualifying Chapter 11 debtors in UST Districts were assessed the increased fees—even debtors in cases commenced before the 2017 Amendment was enacted." *USA Sales, Inc.*, 2021 WL 1226369, at *4.

### C.    Clinton's quarterly fee challenge

Clinton operates plant nurseries—growing trees, shrubs, flowers, and ornamental grasses—in Connecticut, Florida, and Maryland. On December 18, 2017, Clinton filed for Chapter 11 bankruptcy protection in the District of Connecticut, which is a UST District.

In the first quarter of 2018, Clinton made disbursements of approximately $ 3.2 million—well over the $ 1 million threshold of the 2017 Amendment. Since then, Clinton's disbursements have consistently exceeded the threshold.

Accordingly, Clinton has been charged—and has paid—the increased quarterly fees as set forth in the 2017 Amendment.

On April 17, 2019, Clinton filed a motion with the Bankruptcy Court, seeking relief from the increased quarterly fees. Clinton argued that the 2017 Amendment violated the Bankruptcy Clause of the U.S. Constitution, which authorizes Congress to "[t]o establish . . . *uniform* Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4 (emphasis added). Trustee-Appellee William K. Harrington, United States Trustee, Region 2 (the "Trustee") filed an objection to the motion.

On August 28, 2019, the Bankruptcy Court issued an order *sua sponte* converting the contested motion to an adversary proceeding, determining to treat the objection as a motion to dismiss, and dismissing the adversary proceeding for failure to state claims upon which relief could be granted. The Bankruptcy Court agreed with Clinton that the 2017 Amendment was a bankruptcy law subject to the uniformity requirement of the Bankruptcy Clause. But the Bankruptcy Court

also agreed with the Trustee that the 2017 Amendment was uniform on its face. [2]

This direct appeal followed.[3]

### D.    The 2020 Act

Shortly after the parties fully briefed and argued this appeal, Congress amended 28 U.S.C. § 1930 through the 2020 Act.  The 2020 Act changed the word "may" in § 1930(a)(7) to "shall," with the provision now stating in relevant part:

> In districts that are not part of a United States trustee region [i.e. BA Districts]. . . , the Judicial Conference of the United States *shall* require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection.

28 U.S.C. § 1930(a)(7) (emphasis added).

---

[2] By the same order, the Bankruptcy Court determined that another debtor, Triem, LC ("Triem"), did not have standing to challenge the 2017 Amendment because Triem's fees under the 2017 Amendment were identical to the fees Triem would have paid absent the amendment.  Triem has not appealed, and Clinton expressly declines to challenge the standing determination.

[3] On November 8, 2019, a district court in the District of Connecticut certified this matter for direct appeal pursuant to 28 U.S.C. § 158(d)(2)(A).  On April 14, 2020, this Court granted Clinton's petition for permission to appeal in this Court.

## II.    Discussion

This Court reviews a bankruptcy court's legal conclusions *de novo* and accepts a bankruptcy court's factual findings unless such findings are clearly erroneous.  *In re Barnet*, 737 F.3d 238, 246 (2d Cir. 2013).

On appeal, Clinton argues that the Bankruptcy Court erred in rejecting its argument that the 2017 Amendment was unconstitutionally non-uniform on its face.[4]  Clinton explains that, at the time it incurred the disputed quarterly fee charges in this case, § 1930(a)(6) provided that UST Districts "shall" charge the fee increase, while § 1930(a)(7) provided that BA Districts "may" charge the fee increase.  This distinction, according to Clinton, permitted the delayed and then incomplete implementation of the 2017 Amendment's fee increase in the BA Districts, which resulted in a fee discrepancy between the UST and BA Districts and, thus, a lack of constitutionally mandated uniformity.

---

[4] Clinton expressly disclaims any as-applied challenge. *See* Appellants' Br. at 22 n.7 ("To be clear, the Appellants did not and do not make an as-applied challenge to the 2017 Amendment. . . . [T]he Appellants claim that the 2017 Amendment is facially unconstitutional . . . .").

13

The 2020 Act, as explained above, has recently replaced the word "may" with "shall" in § 1930(a)(7).  As amended, the fee schedule set forth in § 1930(a)(6), including the 2017 Amendment, should—at least going forward—apply uniformly in UST Districts and BA Districts.  Nonetheless, we are still left with the question of whether Clinton was charged unconstitutional fees under the prior version of the statute, when the word "may" remained in place and the BA Districts had yet to fully implement the 2017 Amendment's fee increase. [5]

The Trustee raises two arguments in response.  First, the Trustee argues that the Bankruptcy Court erred in holding that the 2017 Amendment is even subject to the Bankruptcy Clause.  Second, assuming the Bankruptcy Clause does govern the analysis, the Trustee defends the Bankruptcy Court's conclusion that the 2017 Amendment does not violate the Bankruptcy Clause.

---

[5] It is by no means obvious that the 2020 Act will entirely eliminate the geographic discrepancy that Clinton argues constitutes unconstitutional non-uniformity.  *See USA Sales, Inc.*, 2021 WL 1226369, at *17 n.46 ("[I]t remains unclear to which cases the Judicial Council will apply the 2020 Act. . . . [I]f the Judicial Council applies the new fees only to cases filed on or after the effective date of the 2020 Act (as the Judicial Council did with the 2017 Amendment), then the constitutional non-uniformity problem will persist.").  We need not, and do not, decide this issue because before us is only the constitutionality of the 2017 Amendment prior to the 2020 Act.

14

We first consider our subject matter jurisdiction and then address each of the Trustee's arguments in turn.

### A. This Court has subject matter jurisdiction to consider Clinton's challenge.

At the outset, we must consider whether this Court has subject matter jurisdiction over Clinton's challenge to the constitutionality of the 2017 Amendment.

"Article III, Section 2 of the Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020). "Standing 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.* ("Cent. States"), 433 F.3d 181, 198 (2d Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case,

15

determining the power of the court to entertain the suit."). Because constitutional standing implicates the subject matter jurisdiction of the Court, we may raise the issue *nostra sponte*. *Cent. States,* 433 F.3d at 198.

"To establish Article III standing, a plaintiff must . . . allege, and ultimately prove, that [the plaintiff] has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003). Here, Clinton filed for bankruptcy prior to October 1, 2018; was subject to a fee increase pursuant to the 2017 Amendment due to the size of its disbursements; and paid more than a similarly situated debtor (*i.e.*, one with the same filing date and disbursement size) would owe in a BA District, where the increased fee schedule had not yet been implemented by the Judicial Conference. Thus, Clinton has sustained a concrete injury-in-fact that is traceable to the geographically discrepant fee increase and that is capable of redress through a partial refund (reducing Clinton's quarterly fees to the level it would have paid had it filed for bankruptcy at the same time in a BA District rather than a UST District). We conclude, therefore,

that Clinton has standing to raise this constitutional challenge and to seek reimbursement.

###    B.    The 2017 Amendment is subject to the uniformity requirement of the Bankruptcy Clause.

Turning to the merits of the constitutional challenge, we must first consider whether the 2017 Amendment is a "Law[] on the subject of Bankruptcies" implicating the uniformity requirement of the Bankruptcy Clause.  U.S. Const. art. 1, § 8, cl. 4.  The Trustee argues that the Bankruptcy Clause does not apply to the 2017 Amendment "because it is an administrative funding measure, not a substantive bankruptcy law."  Appellee's Br. at 13.

The Trustee's argument has been repeatedly rejected by other courts.  *See In re MF Glob. Holdings Ltd.*, 615 B.R. 415, 446 (Bankr. S.D.N.Y. 2020) (collecting cases and observing that "every bankruptcy court that has addressed the constitutionality of the 2017 Amendment under the Bankruptcy Clause" has

"concluded that the 2017 Amendment is 'on the subject of Bankruptcies'").[6]  And

for good reason: The subject of the 2017 Amendment plainly fits within the

Supreme Court's broad definition of "bankruptcy" as "the subject of the relations

between an insolvent or nonpaying or fraudulent debtor and his creditors,

extending to his and their relief."  *Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457,

466 (1982) (internal quotation marks omitted)).   The 2017 Amendment amends a

statute, § 1930, that is literally entitled: "Bankruptcy fees."  *See SCI Direct*, 2020 WL

5929612, at *9.[7]  Under § 1930(a)(6), a debtor must "pay pre-confirmation UST fees

as an administrative priority expense before it pays its commercial creditors,

---

[6] *See also In re SCI Direct, LLC*, 2020 WL 5929612, at *9 (Bankr. N.D. Ohio Sept. 22, 2020) ("[T]he 2017 amendment is clearly a law on the subject of bankruptcies. It appears that every court to address the constitutionality of the 2017 amendment under the Bankruptcy Clause has reached the same conclusion."); *cf. Buffets*, 979 F.3d at 377 ("The consensus view of bankruptcy courts that Chapter 11 fees are Bankruptcy Clause legislation is likely correct. But we need not decide the question because, even assuming it is, we find no uniformity problem.").

[7] Congress created § 1930 as part of a 1978 law entitled "An act to establish *a uniform Law on the Subject of Bankruptcies*."  *In re MF Glob. Holdings Ltd.*, 615 B.R. at 446 (emphasis added) (internal quotation marks omitted).  Decades later, "Congress stated that it was enacting the 2017 Amendment under the Bankruptcy Clause," with "the sponsor of the bill containing the 2017 Amendment . . . inform[ing] Congress that it had the power to enact the 2017 Amendment pursuant to Article 1, Section 8, Clause 4 of the Constitution . . . ." *Id.*

bondholders, and shareholders."  *In re MF Glob. Holdings Ltd.*, 615 B.R. at 445 (internal quotation marks omitted).  Accordingly, any change in fees imposed pursuant to § 1930 "affects the amount of funds available for distribution to lower-priority creditors."  *SCI Direct*, 2020 WL 5929612, at *9 (internal quotation marks omitted).[8]

As the Ninth Circuit reasoned in addressing § 1930 before the 2017 Amendment, the quarterly fee statute "clearly governs the relationship between creditor and debtor and, accordingly, falls within the scope of" the uniformity requirement set forth in the Bankruptcy Clause.  *St. Angelo*, 38 F.3d at 1530.  We reach the same conclusion here.  We hold that, because the 2017 Amendment similarly governs debtor-creditor relations and impacts the relief available, it is a

---

[8] *Accord In re Life Partners Holdings, Inc.*, 606 B.R. 277, 287–88 (Bankr. N.D. Tex. 2019) (because "[t]he fees required by § 1930 are granted administrative claim status in bankruptcies, . . . any increase or decrease in fees payable to the U.S. Trustee affects the amount of funds available for distribution to lower-priority creditors and the debtor"), *abrogated on other grounds by Matter of Buffets, L.L.C.*, 979 F.3d 366 (5th Cir. 2020); *see also In re Mosaic Mgmt. Grp., Inc.*, 614 B.R. 615, 623 (Bankr. S.D. Fla. 2020) (because "[t]he amount of the fee due to the UST directly impacts distributions to other creditors[,] . . . § 1930(a)(6), both before and after enactment of the [2017] Amendment, is a law on the subject of bankruptcies that implicates the related uniformity requirement under the Constitution").

bankruptcy law subject to the Bankruptcy Clause and is constitutional only if "uniform."  U.S. Const. art. I, § 8, cl. 4.

### C.    Prior to the 2020 Act, the 2017 Amendment was unconstitutionally non-uniform on its face.

We turn next to the question of whether, under the version of § 1930 in effect prior to the 2020 Act, the 2017 Amendment violated the uniformity requirement of the Bankruptcy Clause.

The parties do not dispute that, during the period in which Clinton paid the quarterly fees at issue in this case, there was a clear geographic discrepancy in application of the 2017 Amendment's fee increase: debtors like Clinton who filed for bankruptcy in UST Districts were charged the increase beginning January 1, 2018; debtors who filed for bankruptcy in BA Districts before October 1, 2018, were never charged the increase.

The Trustee makes two arguments as to why, notwithstanding the geographic discrepancy, the 2017 Amendment was uniform on its face.  First, the Trustee contends that, under the text of § 1930 prior to the 2020 Act, Congress mandated equal implementation of the 2017 Amendment's fee increase in UST and

20

BA Districts, and the delayed and inconsistent implementation of the fee increase in the BA Districts actually *contravened* statutory language that was facially uniform. Second, the Trustee suggests that a narrowly defined exception to the uniformity requirement—the "geographically isolated problem" exception—justified the fee discrepancy. We find neither argument persuasive.

### 1. The Trustee's proposed textual interpretation is not persuasive.

Clinton, in arguing that the pre-2020 Act version of the 2017 Amendment was non-uniform on its face, traces the fee discrepancy to a lexical distinction between § 1930(a)(6) and § 1930(a)(7). Specifically, § 1930(a)(6) stated that designated fees—before and after the 2017 Amendment's fee increase—"shall" be imposed on debtors in UST Districts. By contrast, before the 2020 Act, § 1930(a)(7) stated that the Judicial Conference "may" impose the same fees from § 1930(a)(6) in BA Districts. *See* 28 U.S.C. § 1930(a)(6)-(7). Thus, by the plain terms of the statute, while § 1930(a)(6) *required* application of the increase in UST Districts, § 1930(a)(7) *permitted* application of the increase in BA Districts. And it is this distinction, Clinton explains, that yielded the dissimilar application: In accordance

21

with the discretion afforded by the permissive language of § 1930(a)(7), the Judicial Conference delayed the implementation of the fee increase in the BA Districts for nine months and, even after implementation, did not apply the increase on a going-forward basis to debtors who filed for bankruptcy prior to the implementation date.

The Trustee asks us to ignore the distinction between the "shall" used in § 1930(a)(6) and the "may" used in § 1930(a)(7), urging us to view both provisions as imposing, uniformly, a mandatory obligation.  He emphasizes that § 1930(a)(7) was enacted to eliminate the uniformity problem identified by the Ninth Circuit in *St. Angelo*, supporting Congress's intent to harmonize fees.  Through this lens, the Trustee reasons, the Judicial Conference's delayed implementation in the BA Districts would appear an unauthorized act which would not render the statute itself non-uniform.  *See* Appellee's Br. at 28–29 ("Nothing in Congress's 2017 amendment authorized, much less directed, the Judicial Conference to implement the amendment on a different effective date. . . . The failure to implement a fee

statute consistently across all judicial districts does not render the statute itself unconstitutional . . . .").

We cannot, however, simply overlook Congress's decision to use the permissive term "may" in § 1930(a)(7). To be sure, the Supreme Court has acknowledged that, in some limited scenarios, the word "may" can impose a mandatory directive: Although "[t]he word 'may,' when used in a statute, usually implies some degree of discretion[,] . . . [t]his common-sense principle of statutory construction is by no means invariable . . . and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." *United States v. Rodgers*, 461 U.S. 677, 706 (1983) (footnote and citations omitted). Here, however, the choice of the permissive term appears particularly intentional given that Congress used "shall" in numerous other places in § 1930—and even in § 1930(a)(7) itself, which, in its pre-2020 Act form, read in full:

> In districts that are not part of a United States trustee region as defined in section 581 of this title, the Judicial Conference of the United States *may* require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this

subsection. Such fees *shall* be deposited as offsetting receipts to the fund established under section 1931 of this title and *shall* remain available until expended.

28 U.S.C. § 1930(a)(7) (emphasis added). The Supreme Court cautions against ignoring contexts in which "Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section," and where "[e]lsewhere in [the same statute], Congress used 'shall' to impose discretionless obligations." *Lopez v. Davis*, 531 U.S. 230, 241 (2001).[9]

_____

[9] We note that, in amending § 1930(a)(7) to replace "may" with "shall," the 2020 Act purports to "confirm the longstanding intention of Congress that quarterly fee requirements remain consistent across all Federal judicial districts." Pub. L. No. 116-325, § 2(a)(4)(B). While we certainly may consider a later Congress's statements regarding the intention of the Congress that originally drafted § 1930(a)(7), we are not constrained to view such statements as dispositive. *See Fed. Hous. Admin. v. Darlington, Inc*., 358 U.S. 84, 90 (1958) (explaining that "[s]ubsequent legislation which declares the intent of an earlier law" is "entitled to weight" but is not "conclusive in determining what the previous Congress meant"); *see also Haynes v. United States*, 390 U.S. 85, 87 n.4 (1968) ("The view of a subsequent Congress of course provide no *controlling* basis from which to infer the purposes of an earlier Congress." (emphasis added)); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 244 (2d Cir. 1996) (observing both that "subsequently enacted legislation might not be a reliable guide to the intent of a prior Congress" and also that "subsequent Congressional actions should not be rejected out of hand as a source that a court may consider in the search for legislative intent" (internal quotation marks omitted)). Ultimately, we cannot ignore the fact that, in analyzing the motivations behind the earlier Congress's choice of the word "may," the Congress that passed the 2020 Act inevitably looked through the lens of the constitutional quagmire that resulted. *Cf. Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."). We conclude that the ordinary meaning of "may" as permissive rather than

Additionally, in recently rejecting the Trustee's proposed textual interpretation, the Fifth Circuit explained that "[t]he Judicial Conference's delayed implementation of the fee increase highlights the difference between 'may' and 'shall.'" *Matter of Buffets, L.L.C.*, 979 F.3d at 378 n.10.[10]  It is, indeed, telling that the Judicial Conference itself apparently understood the 2017 Amendment as authorizing, but not requiring, it to impose a fee increase in BA Districts.  Although "courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional," *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019), for the

---

mandatory (which, apparently, is how the Judicial Conference understood the word) outweighs Congress's subsequent statement regarding its earlier meaning (which, we note, it oddly purported to confirm in a statute where it decided to amend that very language).

[10] *See also In re Circuit City Stores, Inc.*, No. 19-2240, 2021 WL 1679568, at *12 (4th Cir. Apr. 29, 2021) (Quattlebaum, *J.* concurring in part and dissenting in part) (declining to read "may" in 28 U.S.C. § 1930(a)(7) as imposing a mandatory obligation; *USA Sales, Inc.*, 2021 WL 1226369, at *17 ("[A]lthough the term 'may' is sometimes used (sloppily) to signify a mandatory obligation, Congress' use of the term 'shall' in 28 U.S.C. § 1930(a)(6) is unambiguously mandatory, which indicates that term 'may' in the following paragraph, 28 U.S.C. § 1930(a)(7), is intended to be permissive.  In other words, Congress required the new fees in the UST Districts but only allowed for their possibility in the BA Districts.  The decision of the Judicial Conference to delay its adoption of the 2017 Amendment further underscores the difference between the terms 'may' and 'shall.'" (internal quotation marks, alterations, and citations omitted)).

reasons we have already discussed, we find no ambiguity in the statute's grant of permissive authority to the Judicial Conference to adjust fees and thus are obliged to identify unconstitutionality.

### 2. The "geographically isolated problem" exception does not apply.

The Trustee suggests that we can nonetheless salvage the constitutionality of the 2017 Amendment through application of the "geographically isolated problem" exception to the uniformity requirement—an exception recognized by the Supreme Court in *Blanchette v. Connecticut General Insurance Corp.*, 419 U.S. 102 (1974). In *Blanchette*, the Supreme Court addressed the constitutionality of the Rail Act, which set special laws for bankrupt railroads and expressly applied only to a particular geographic region. The Supreme Court concluded that the Rail Act did not contravene the Bankruptcy Clause's uniformity requirement because all of the country's bankrupt railroads at that time were located in the designated region and therefore, in targeting the national rail transportation crisis, the statute addressed a geographically isolated problem. *Id*. at 159–160. *Blanchette* explained, "The problem dealt with (under the Bankruptcy Clause) may present significant

variations in different parts of the country. . . . [T]he uniformity clause was not intended to hobble Congress by forcing it into nationwide enactments to deal with conditions calling for remedy only in certain regions." *Id*. at 159 (internal quotation marks, alterations, and citations omitted).

Several bankruptcy courts across the country have applied the "geographically isolated problem" exception in upholding the constitutionality of the 2017 Amendment.[11] The Fifth Circuit's majority opinion in *Buffets* ultimately took the same approach, reasoning that the exception applied because the 2017 Amendment aimed to ensure proper funding of the UST System—a system that exists only in an isolated geographic region. *See Buffets*, 979 F.3d at 378 ("Just as it did in addressing the failure of railroads in the industrial heartland, Congress

---

[11] *See SCI Direct*, 2020 WL 5929612, at *10 ("[T]he 2017 amendment . . . remedies a geographically isolated problem that is unique to UST Program Districts, i.e. the depletion of the UST System Fund."); *MF Glob. Holdings Ltd.*, 615 B.R. at 447 ("[T]he 2017 Amendment applies uniformly to debtors in UST Districts to solve the depleting funding unique to the UST Districts."); *Mosaic*, 614 B.R. at 624 (the 2017 Amendment is not unconstitutionally non-uniform on the whole because the "overarching purpose" of the 2017 Amendment is to "eliminat[e] a funding shortfall in the UST system and develop[] a reasonable reserve for the same," and "the Amendment effected a fee increase only in districts where the UST is active").

confronted the problem of an underfunded Trustee Program where it found it: in the Trustee districts.").[12]  The Fourth Circuit's majority opinion in *In re Circuit City Stores, Inc.*, agreed with the Fifth Circuit's reasoning and similarly applied the "geographically isolated problem" exception.  *See* 2021 WL 1679568, at *6 ("Because only those debtors in Trustee districts use the U.S. Trustees, Congress reasonably solved the shortfall problem with fee increases in the underfunded districts.").

We are concerned, however, that the bankruptcy courts and the *Buffets* and *Circuit City* opinions have overlooked a critical distinction.  The Supreme Court did hold in *Blanchette* that Congress may "take into account differences that exist between different parts of the country, and . . . fashion legislation to resolve

_____

[12] *See also Buffets*, 979 F.3d at 378 ("[Congress] drew a program-specific distinction that only indirectly has a geographic dimension.  It does make it more expensive for a debtor in Texas than a debtor in North Carolina to go through bankruptcy, but that is not an arbitrary distinction based on the residence of the debtor or creditors; it is a product of the Texas debtor's use of the Trustee. By increasing fees for large debtors in those districts, Congress sought to remedy a shortfall in the program's funding.  Only debtors in Trustee Districts use trustees, so Congress could solve the evil to be remedied with a fee increase in just the underfunded districts." (internal quotation marks and citation omitted)).

geographically isolated problems." 419 U.S. at 159.  But the Supreme Court later clarified in *Gibbons* that, "[t]o survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors."  *Gibbons*, 455 U.S. at 473.  In *Blanchette*, all members of the class of debtors impacted by the statute were confined to a sole geographic area: The statute applied only to bankrupt railroad companies, and there were no bankrupt railroad companies located outside the statutorily designated region.  *See Blanchette*, 419 U.S. at 159–60.[13]  Here, by contrast, the 2017 Amendment's fee increase applies to the class of debtors whose disbursements exceed $ 1 million, and there has been no suggestion that members of that broad class are absent in the BA Districts.  This case therefore presents the exact problem avoided in *Blanchette*: Two debtors, identical in all respects save the

---

[13] *See id.* ("The national rail transportation crisis that produced the Rail Act centered in the problems of the rail carriers operating in the region defined by the Act, and these were the problems Congress addressed.  No railroad reorganization proceeding, within the meaning of the Rail Act, was pending outside that defined region on the effective date of the Act or during the 180-day period following the statute's effective date.  Thus the Rail Act in fact operates uniformly upon all bankrupt railroads then operating in the United States and uniformly with respect to all creditors of each of these railroads." (footnote omitted)).

geographic locations in which they filed for bankruptcy, are charged dramatically different fees.[14]

Nor is the funding shortfall plaguing the UST system caused by a "geographically isolated problem" that would place the entire class of affected debtors only in those districts. Rather, the distinction between UST Districts and BA Districts appears to exist only because Congress chose—for politically expedient reasons—to create a dual bankruptcy system. *Matter of Buffets, L.L.C.*, 979 F.3d at 383 (Clement, *J.*, concurring in part and dissenting in part) (identifying distinction as an "arbitrary political relic"). Indeed, the UST program was intended to be a uniform, nationwide program, but lawmakers in Alabama and North Carolina resisted and, after receiving a number of extensions, ultimately were granted a permanent exemption from the UST program in an unrelated law.

---

[14] *Cf. In re Circuit City Stores, Inc.*, 606 B.R. 260, 270 (Bankr. E.D. Va. 2019), *aff'd in part, rev'd in part and remanded*, No. 19-2240, 2021 WL 1679568 (4th Cir. Apr. 29, 2021) ("Had the Debtors filed their chapter 11 bankruptcy petitions a mere 140 miles south in Raleigh, North Carolina, the Debtors would be paying substantially lower quarterly fees than they are paying now. This is the type of regionalism the Uniformity Clause was intended to prevent." (footnote and internal quotation marks omitted)).

*Id.*  To allow Congress to use that variation to justify charging different fees is to "rel[y] on a flawed tautology: Congress can justify treating bankrupts differently because it has chosen to treat them differently (higher fees because different programs)."  *Id.* [15]  Put another way: Application of the "geographically isolated problem" exception here would yield the following inexplicable rule: Congress must enact uniform laws on the subject of bankruptcy . . . except when Congress elects to treat debtors non-uniformly.   Such reasoning would render the uniformity requirement of the Bankruptcy Clause of the Constitution effectively meaningless.

In sum, we cannot evade a finding of non-uniformity through either a contortion of the statutory text or an application of the "geographically isolated

---

[15] The partial dissent in *Circuit City* similarly recognized that "[j]ustifying the differences here on the fact that the Trustee Program districts face the budgetary problems . . . ignores the fact that those districts only face the budgetary problems because Congress treated them differently in the first place."  *Circuit City*, 2021 WL 1679568, at *13 (Quattlebaum, *J.*, concurring in part and dissenting in part); *see also USA Sales, Inc.*, 2021 WL 1226369, at *17 (declining to conclude "that the relevant class of debtors for the purpose of the 2017 Amendment is Chapter 11 debtors in UST districts" because this "fails to address why Chapter 11 debtors in UST Districts are required to use the UST in the first place, whereas debtors in BA Districts get to use less-expensive Administrators"  (internal quotation marks, citations, and footnote omitted)).

problem" exception.  We conclude that the 2017 Amendment, prior to the 2020 Act, was unconstitutional on its face insofar as it charged higher fees to debtors in UST Districts.[16]  To the extent that Clinton has already paid the unconstitutional fee increase, it is entitled to a refund of the amount in excess of the fees it would have paid in a BA District during the same time period.  In directing this refund, however, we note that our ruling is limited to the particular debtors who brought this appeal, who, as discussed above, clearly have standing to seek reimbursement.

## III.    Conclusion

In sum, we hold as follows:

---

[16] As noted, *see supra* at n.5, we conclude only that the pre-2020 Act version of the 2017 Amendment, 28 U.S.C. § 1930(a)(6)(B), was facially unconstitutional.  We do not address the constitutionality of the current version, or of any other portion of § 1930, or of any other aspect of the UST/BA District system.  Clinton raises only a narrow challenge to the pre-2020 Act version of the 2017 Amendment, and we confine our ruling to that provision.  *Cf. St. Angelo*, 38 F.3d at 1532 ("In determining whether the statutory scheme governing the U.S. Trustee system in general, and the fee structure outlined in 28 U.S.C. § 1930 in particular, are unconstitutional, we must adhere to the principle of judicial restraint. . . . [C]ourts must cautiously exercise their power to declare a statute constitutionally void and narrowly confine their holdings when possible.").

1.   Clinton has standing to bring its constitutional challenge and to seek reimbursement because it filed for bankruptcy in a UST District prior to October 1, 2018; qualified for and paid a fee increase pursuant to the 2017 Amendment due to the size of its disbursements; and paid more than a similarly situated debtor (with the same filing date and disbursement size) would owe in a BA District, where the increased fee schedule had not yet been implemented by the Judicial Conference.

2.   Because the 2017 Amendment governs debtor-creditor relations, it is subject to the uniformity requirement of the Bankruptcy Clause.

3.   Prior to the 2020 Act, the 2017 Amendment was unconstitutionally non-uniform on its face because it *mandated* a fee increase in UST Districts but only *permitted* a fee increase in BA Districts.

We therefore **REVERSE** the judgment of the Bankruptcy Court and direct that the Bankruptcy Court provide Clinton with a refund of the amount of quarterly fees paid in in excess of the amount Clinton would have paid in a BA District during the same time period.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

33